1 | David M. Karen, Esq.
State Bar No. 117883
2 | dk@dk4law.com
Kimberly Offenbacher, Esq.
3 | State Bar No. 166318
ko@dk4law.com
4 |
5 | **DK LAW GROUP, LLP**
3155 Old Conejo Road
Thousand Oaks, CA 91320
6 | Tel: (805) 498-1212
Fax: (805) 498-3030
7 |
8 | Attorneys for Plaintiffs JOSE RIERA;
MICHELLE HIMES; DIANE SCURRAH;
DEBORAH CHASE; MARCIA BENJAMIN;
9 | AND DANIEL BENJAMIN, Individually
and on behalf of all others similarly situated
10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 |

| | |
|---|---|
| 14   JOSE RIERA; MICHELLE HIMES; DIANE SCURRAH; DEBORAH | Case No.: **2:17-cv-06686 RGK-PJW** |
| 15   CHASE; MARCIA BENJAMIN; and DANIEL BENJAMIN, individually, and | **CLASS ACTION** |
| 16   on behalf of all others similarly situated, | THIRD   AMENDED   COMPLAINT FOR: |
| 17              Plaintiffs, | |
| 18        v. | 1. NEGLIGENCE/NEGLIGENCE *PER SE* (Adulteration & Misbranding); |
| 19   MECTA CORPORATION; SOMATICS, LLC, | 2. NEGLIGENCE/NEGLIGENCE *PER SE* (Failure to Timely |
| 20              Defendants. | Investigate, Evaluate, and Report Adverse Events); |
| 21 | |
| 22 | 3. STRICT LIABILITY—FAILURE TO WARN; |
| 23 | |
| 24 | 4. STRICT LIABILITY (Adulteration & Misbranding); and |
| 25 | 5. LOSS OF CONSORTIUM. |
| 26 | |
| 27 | **DEMAND FOR JURY TRIAL** |
| 28 | |

-1-

Plaintiffs JOSE RIERA, MICHELLE HIMES, DIANE SCURRAH, DEBORAH CHASE, MARCIA BENJAMIN and DANIEL BENJAMIN, (collectively "Plaintiffs"), individually and on behalf of all other similarly situated individuals, hereby complain against Defendants MECTA CORPORATION and SOMATICS, LLC (collectively "Defendants") and, on information and belief, allege as follows:

## SUMMARY OF THE ACTION

1.    This is a class action brought by Plaintiffs, on behalf of themselves and other similarly situated electroconvulsive therapy ("ECT") patients, who have sustained injuries resulting from Defendants' conduct.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1332.

2.    An ECT shock device is "a device used for treating severe psychiatric disturbances (e.g., severe depression) by inducing in the patient a major motor seizure by applying a brief intense electrical current to the patient's head." 21 C.F.R. § 882.5940(a).  An ECT shock device, in lay terms, is used to administer 'shock treatment.'

3.    The California Department of Mental Health reported 3,302 patients given ECT in 2001 alone.  The number of patients given ECT shock treatment in California per year is likely to have increased since that time.

4.    The primary demographic for ECT shock treatment is comprised of patients suffering from bipolar disorder ("BPD") and/or severe depression.  ECT shock treatment is liberally prescribed for a variety of psychological disorders including, but not limited to schizophrenia and catatonia.  ECT shock treatment is used on patients of all ages, including children and the elderly.

5.    Plaintiffs and members of the putative class are individuals suffering from ECT-induced brain trauma and varying degrees of ensuing physiological, psychological and emotional injury including, but not limited to permanent brain dysfunction, severe permanent cognitive and memory impairment, lasting short-

term memory difficulties, acute and/or chronic organic brain syndrome, and complete neurological collapse secondary to ECT shock treatment.

6.     Despite statutory duties under the Food, Drug and Cosmetic Act ("FDCA") and directives by the Food & Drug Administration ("FDA") that ECT device manufacturers report information concerning safety and effectiveness testing for their devices to the FDA, no ECT device manufacturer, including MECTA CORPORATION or SOMATICS, LLC, complied with these statutory obligations. Neither Defendant responded to the FDA's order requiring submission of a summary of, and a citation to, all safety and effectiveness data known or available concerning the use of their devices by August 14, 1997.

7.     Prior to the filing of the Complaint in this action, the only order by the FDA to which Defendants responded was one mandated by the Safe Medical Devices Act of 1990 ("SMDA") requiring Defendants' submission of a summary of, and citation to, any information known or otherwise available about the safety and effectiveness of their ECT devices by August 7, 2009. Defendants' responses failed to include nearly all adverse safety and effectiveness information relating to use of ECT shock devices. Defendants also grossly understated the incidence of death resulting from ECT. Such a response by Defendants failed to comply with their statutory reporting requirements under the MDA and SMDA.

8.     As a direct and proximate result of Defendants' refusal to comply with multiple orders by the FDA and satisfy their state duties running parallel to their federal statutory duties, as of the time of this filing, Defendants have not provided the FDA with the information it has requested in order to determine whether submission of a PMA should be required, as is typical for Class III medical devices. To this day, ECT devices have never satisfied the stringent premarket approval standards that Class III medical devices are required to meet.

9.     Because of the lack of testing rigor, the mechanism of action by which ECT may provide any benefit to patients, if indeed it does, remains unascertained

-3-

and unknown.  Testing over the years has not shown any conclusive benefit to those receiving ECT shock treatment beyond those that may be associated with a brief bout of mania in the short-term.  Conversely, the risks of ECT use remain apparent and include but are not limited to concussive brain injury and debilitating electrical brain trauma, resulting in permanent long-term memory loss, lasting cognitive impairment, seizures, acute and/or chronic organic brain syndrome, complete neurological collapse, and death.

10.    But for Defendants' failure to comply with the FDCA, MDA, and SMDA, the putative class members would not have suffered the injuries alleged in this complaint.  Compliance required Defendants to investigate, solicit, and report information upon learning that their ECT devices may have contributed to a death or serious injury and specifically report all "reasonably known" information to the FDA. The FDA makes all such information public in order to warn patients, medical providers and the general public of risks inherent in certain medical devices.

11.    Defendants' failure to submit to the FDA all safety and effectiveness data reasonably known and/or available relating to use of their ECT devices by certain effective dates for premarket approval rendered their devices "misbranded" under the FDCA.

12.    Defendants' failure to investigate, evaluate, and file adverse event reports pertaining to occasions on which their devices may have caused or contributed to a death or serious injury also rendered their devices "misbranded" under the FDCA.

13.    Somatics, LLC has utilized a contract manufacturer unregistered with the FDA to manufacture all of its "Thymatron" devices for decades. A device manufactured by an unregistered contract manufacturer is "misbranded" under the FDCA.

///

THIRD AMENDED COMPLAINT

14.   Moreover, all modern ECT devices are marketed as "substantially equivalent" to pre-1976 "predicate" devices, but the predicate devices were not legally marketed for failure to timely investigate and report adverse events. According to Defendants contentions, modern ECT devices have different intended uses than predicate devices and differ in design and function.   Although the contention is unestablished, if it were proven true the "different" modern devices would not meet the requirement that they be "substantially equivalent" to their predicate devices, and the 510(k) clearance for all modern ECT devices is invalid. To the extent Class III devices are not substantially equivalent to a predicate, a PMA would be required for modern ECT device, as the modern device would raise new questions of safety and effectiveness.   As Defendants have submitted no PMA application relative to the allegedly different, modern ECT devices, these devices are "adulterated" and are being manufactured and marketed in violation of the FDCA.

15.   The manufacture, introduction, or receipt of an adulterated or misbranded medical device through interstate commerce is prohibited under the FDCA.[1]

16.   Defendants' failure to comply with federal medical device regulations by investigating, evaluating, and reporting information reasonably suggesting death or serious injury with which their devices may have been associated resulted in a lack of knowledge among the medical providers of members of the putative class and the public in general about the risk of craniocerebral trauma inherent in administration of ECT shock treatment, but they nevertheless continued to market their adulterated, misbranded, and defective ECT shock devices in the United States.   Because some form of physiological, psychological, or emotional injury results universally from ECT shock treatment, Defendants' conduct directly and proximately caused injuries to the putative class.

---

[1] 21 U.S.C. § 331.

17.     This class action seeks to remedy the damages caused by Defendants' conduct: violating the state law reporting duties running parallel to the Food, Drug & Cosmetic Act and causing harm by placing an adulterated, misbranded, and defective product into the stream of commerce.  Defendants' violation of federal statutory duties, as demonstrated by (1) Defendants' failure to comply with all administrative orders by the FDA requiring Defendants to submit to the FDA all safety and effectiveness data reasonably known and/or available for their ECT shock devices by certain effective dates and (2) failure to maintain systems for the timely investigation, evaluation, and reporting of adverse events to the FDA, resulted in the decades-long circulation of misbranded and adulterated medical devices in the stream of commerce as well as a lack of knowledge among the medical providers of members of the putative class and the public in general about craniocerebral trauma caused by ECT shock treatment.

## **PARTIES**

18.     Plaintiff MARCIA BENJAMIN ("M. BENJAMIN") is a citizen of the State of California.

19.     Plaintiff DANIEL BENJAMIN ("D. BENJAMIN") is a citizen of the State of California.

20.     Plaintiff JOSE RIERA ("RIERA") is a citizen of the State of California.

21.     Plaintiff MICHELLE HIMES ("HIMES") is a citizen of the State of California.

22.     Plaintiff DIANE SCURRAH ("SCURRAH") is a citizen of the State of California.

23.     Plaintiff DEBORAH CHASE ("CHASE") is a citizen of the State of California.

24.     Plaintiffs are informed and believe and based thereon allege that, at all relevant times, Defendant MECTA CORPORATION ("MECTA") is and was a

corporation formed and existing under the laws of the State of Oregon with its principal place of business at 19799 SW 95th Place B, Tualatin, Oregon.  Plaintiffs are further informed and believe and based thereon allege that MECTA is an ECT manufacturer and provider and, in that regard is authorized to conduct business in the State of California and does conduct business in the State of California.

25.    Plaintiffs are informed and believe and based thereon allege that, at all relevant times, starting with its founding in 1984, Defendant SOMATICS, LLC ("SOMATICS") is and was a limited liability company formed and existing under the laws of the State of Florida with its principal place of business at 710 Commerce Dr., Unit #101, Venice, FL 34292. Plaintiffs are further informed and believe and based thereon allege that SOMATICS is an ECT manufacturer and provider and, in that regard is authorized to conduct business in the State of California and does conduct business in the State of California.

26.    Plaintiffs are informed and believe, and on the basis of such information and belief allege, that each fictitiously named Defendant is legally responsible for the acts alleged herein, and/or is liable to Plaintiffs as hereinafter alleged.

27.    Plaintiffs are informed and believe, and, based upon such information and belief allege that the Defendants named in this action and each of them, herein knowingly conspired together in various combinations, and agreed amongst themselves to act in concert and in furtherance of a common scheme, plan and design to commit, aid, abet and/or render substantial assistance in the wrongs complained of herein below.  Plaintiffs are further informed and believe, and based upon such information and belief allege that Defendants knew as they were conducting themselves that they were substantially assisting in the accomplishment of wrongdoing, and had the right and ability to control the actions of the remaining Defendants but did nothing to curb the activities described herein below, or prevent others from engaging in such conduct.  Plaintiffs are further informed and believe,

and based upon such information and belief allege, that Defendants, and each of them, actively condoned, encouraged, participated in, and/or instigated the conduct described herein below in furtherance of their common scheme, plan and design which entailed, among other things:  (a) aiding and abetting the conspiracy and common course of conduct complained of herein;  (b) participating in and/or knowing and acquiescing in the acts complained of herein, sufficient to categorize such conduct as conspiratorial;  and (c) taking and/or ratifying conduct to enrich themselves or their co-conspirators, at the expense of Plaintiffs.

28.    Plaintiffs are informed and believe that Defendants, and each of them, are in some manner legally responsible for the events alleged in this Complaint. Plaintiffs are further informed and believe that each of the Defendants acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan, policy, or enterprise, or aided and abetted the acts and omissions alleged herein, and that the acts and omissions of each Defendant are legally attributable to the other Defendants.

29.    Plaintiffs are informed and believe that Defendants are the only manufacturers    of    ECT    devices    within    the    United    States.

**JURISDICTION AND VENUE**

30.    This Court has subject matter jurisdiction over the lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorney's fees, and costs; and (3) Plaintiffs and Defendants are citizens of different states to the extent required by statute.

31.    This Court has subject matter jurisdiction over the lawsuit under 28 U.S.C. § 1331 because the vindication of Plaintiffs' rights under state law substantially and necessarily turn on a construction of federal law, specifically 21 U.S.C. § 360e with respect to premarket approval applications, 21 U.S.C. § 360i

with respect to medical device manufacturer reporting requirements, and 21 U.S.C. § 351 with respect to the illegality of marketing adulterated or misbranded medical devices.

32.     This Court has personal jurisdiction over Defendant MECTA because it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper.

33.     This Court has personal jurisdiction over Defendant SOMATICS because it has sufficient minimum contact in California to render the exercise of jurisdiction by this Court proper.

34.     Venue is proper in the Central District of California under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims, including ECT shock treatment received by representative Class members, occurred in this District.

## PLAINTIFF-SPECIFIC ALLEGATIONS

35.     Plaintiff M. BENJAMIN, in seeking an effective treatment for symptoms relating to withdrawal from psychotropic medication, underwent a series of 22 separate rounds of ECT shock treatment between about January 2011 to September 2014. ECT did not improve M. BENJAMIN's symptoms relating to psychotropic medication withdrawal. Instead, ECT caused severe physiological, psychological, and emotional injury, including dental trauma and brain injury.

36.   Following treatment, M. BENJAMIN did not know and had no reason to know that she had sustained a concussive brain injury from ECT use or that the symptoms she was experiencing post-treatment were the result of a concussive brain injury, or would be long-term or permanent. M. BENJAMIN incorrectly but reasonably believed that she was experiencing only minor short-term side effects from ECT use that would improve over time as no information to the contrary was given to her by her medical providers. Following treatment, M. BENJAMIN also did not know and had no reason to know or suspect that wrongful

conduct had caused her to suffer concussive brain injury, or was attributable to ECT device manufacturers' violation of the FDCA, causing ECT device to be available and recommended for use on her, without warning of the true risks of brain trauma and therefore without adequate informed consent.

37.   Towards the end of 2016, in the course of having conferred with counsel, M. BENJAMIN learned for the first time that Defendants had failed to comply with multiple administrative orders by the FDA, had never obtained FDA approval for their ECT devices, and had never maintained a system for the timely investigation, evaluation, and reporting of adverse events, and that this wrongful conduct on the part of Defendants had caused ECT to be available as a recommended treatment, caused her to be a recommended candidate and caused her to undergo ECT treatment and to sustain the concussive brain injury.

38.   Prior to the end of 2016, when the Citizen Petition for reclassification and/or banning of ECT devices became public, she had no reason to suspect, or inquire as to, the wrongful conduct or the nature of her injuries caused by that conduct.  However, even if she had inquired earlier, no amount of inquiry would have revealed the danger of concussive brain injury likely to result from ECT shock treatment or the wrongful conduct of Defendants in having failed to comply with regulatory requirements.  This information was unavailable to the medical community at large and to these plaintiffs in particular, specifically because of Defendants' noncompliance with regulations, including failure to report adverse events attributable to ECT use in the MAUDE database at any time prior to filing the within litigation.

39.   Plaintiff D. BENJAMIN is and has been, at all times relevant to the allegations herein, lawfully married to Plaintiff M. BENJAMIN. D. BENJAMIN suffers a loss of consortium that M. BENJAMIN offered during the course of their marriage as a result of ECT shock treatment.  D. BENJAMIN had no reason to know or inquire as to whether his wife had sustained injuries a result of wrongful

conduct until the end of 2016, in privileged consultation with counsel.  As her husband, D. BENJAMIN's delayed discovery of his wife's injury and its wrongful cause followed the same course as his wife's as set forth in Paragraph 35 above.

40.   Plaintiff RIERA, in seeking an effective treatment for severe depression, underwent a series of six separate rounds of ECT shock treatment on April 22, 2016, April 25, 2016, April 27, 2016, April 29, 2016, May 2, 2016, and May 4, 2016 at Huntington Memorial Hospital in Pasadena, California. ECT did not generate any improvement in RIERA's severe depression.  Instead, it caused severe physiological, psychological, and emotional injury, including brain injury. Following treatment, RIERA did not know and had no reason to know that he had sustained a concussive brain injury from ECT use, or that the symptoms he was experiencing post-treatment were the result of a concussive brain injury, or that they would be long-term or permanent.  RIERA incorrectly but reasonably believed that he was experiencing only minor short-term side effects from ECT use that would improve over time, as no information to the contrary was given to him by his medical providers.  Following treatment, RIERA also did not know and had no reason to know or suspect that wrongful conduct had caused him concussive brain injury or was attributable to the noncompliance with federal regulation by ECT manufacturers causing ECT device to be available and recommended for use, without warning of the true risks of brain trauma as inadequate informed consent.

41.   Towards the end of 2016, in the course of having conferred with counsel, RIERA learned for the first time that Defendants had failed to comply with multiple administrative orders by the FDA, had never obtained FDA approval for their ECT devices, and had never maintained a system for the timely investigation, evaluation, and reporting of adverse events and that this wrongful conduct on the part of Defendants had caused ECT to be available as a recommended treatment, caused him to be a recommended candidate and caused him to undergo ECT treatment and to sustain the concussive brain injury without warning.

42.    Prior to the end of 2016, when the Citizen Petition for reclassification and/or banning of ECT devices became public, he had no reason to suspect, or inquire as to, the wrongful conduct or the nature of his injuries caused by that conduct.  However, even if he had inquired earlier, no amount of inquiry would have revealed the danger of concussive brain injury likely to result from ECT shock treatment, or the wrongful conduct of Defendants in having failed to comply with regulatory requirements.  This information was unavailable to the medical community at large and to these plaintiffs in particular, specifically because of Defendants' noncompliance with regulations, including failure to report adverse events attributable to ECT use in the MAUDE data base at any time prior to filing the within litigation.

43.    Plaintiff HIMES obtained over twenty rounds of ECT shock treatment between about April 2011 and about July 2012 at Sharp Mesa Vista Hospital in San Diego, California.  As a result of receiving ECT shock treatment, HIMES suffers severe physiological, psychological, and emotional injury, including brain injury.  Plaintiff HIMES's husband suffers a loss of the consortium that HIMES offered during the course of their marriage as a result of HIMES's receipt of ECT shock treatment. Following treatment, HIMES did not know and had no reason to know that she had sustained a concussive brain injury from ECT use, or that the symptoms she was experiencing post-treatment were the result of a concussive brain injury, or that they would be long term or permanent.  HIMES incorrectly but reasonably believed that she was experiencing only minor short-term side effects from ECT use that would improve over time, as no information to the contrary was given to her by her medical providers.  Following treatment, HIMES also did not know and had no reason to know or suspect that wrongful conduct had caused her concussive brain injury, or that it was attributable to ECT manufacturers' violation of FDA regulations, causing ECT device to be available and recommended for use on her, without warning of the true risks of brain trauma without adequate consent.

44.     Towards the very end of 2016 or the beginning of 2017, in the course of having conferred with counsel, HIMES learned for the first time that Defendants had failed to comply with multiple administrative orders by the FDA, had never obtained FDA approval for their ECT devices, and had never maintained a system for the timely investigation, evaluation, and reporting of adverse events and that this wrongful conduct on the part of Defendants had caused ECT to be available as a recommended treatment, caused her to be a recommended candidate and caused her to undergo ECT treatment and to sustain the concussive brain injury.

45.     Prior to the end of 2016, when the Citizen Petition for reclassification and/or banning of ECT devices became public, she had no reason to suspect, or inquire as to, the wrongful conduct or the nature of her injuries caused by that conduct.  However, even if she had inquired earlier, no amount of inquiry would have revealed the danger of concussive brain injury likely to result from ECT shock treatment or the wrongful conduct of Defendants in having failed to comply with regulatory requirements.  This information was unavailable to the medical community at large, and to these plaintiffs in particular, specifically because of Defendants' noncompliance with regulations, including failure to report adverse events attributable to ECT use in the MAUDE data base at any time prior to filing the within litigation.

46.     Plaintiff SCURRAH underwent over fifty-eight rounds of ECT shock treatment in seeking to treat her bipolar disorder, beginning on March 28, 2012 and continuing for about nine months.  ECT shock treatment caused SCURRAH severe physiological, psychological, and emotional injury, including brain injury. Following treatment, SCURRAH did not know and had no reason to know that she had sustained a concussive brain injury from ECT use or that the symptoms she was experiencing post-treatment were the result of a concussive brain injury, or that it would be long term or permanent.  SCURRAH incorrectly but reasonably believed that she was experiencing only minor short-term side effects from ECT use that

would improve over time, as no information to the contrary was given to her by her medical providers. Following treatment, SCURRAH also did not know and had no reason to know or suspect that wrongful conduct had caused her concussive brain injury, or that it was attributable to ECT manufacturers' violations of federal regulations, which caused ECT device to be available and recommended for use on her, without warning of the true risks of brain trauma and therefore without adequate informed consent.

47.   Towards the end of 2016 or during the early part of 2017, in the course of having conferred with counsel, SCURRAH learned for the first time that Defendants had failed to comply with multiple administrative orders by the FDA, had never obtained FDA approval for their ECT devices, and had never maintained a system for the timely investigation, evaluation, and reporting of adverse events and that this wrongful conduct on the part of Defendants had caused ECT to be available as a recommended treatment, caused her to be a recommended candidate and caused her to undergo ECT treatment and to sustain the concussive brain injury.

48.   Prior to the end of 2016, when the Citizen Petition for reclassification and/or banning of ECT devices became public, she had no reason to suspect, or inquire as to, the wrongful conduct or the nature of her injuries caused by that conduct. However, even if she had inquired earlier, no amount of inquiry would have revealed the danger of concussive brain injury likely to result from ECT shock treatment or the wrongful conduct of Defendants in having failed to comply with regulatory requirements. This information was unavailable to the medical community at large and to these plaintiffs in particular, specifically because of Defendants' noncompliance with regulations, including failure to report adverse events that may be attributable to ECT use in the MAUDE data base at any time prior to filing the within litigation.

///

49.    Plaintiff CHASE underwent ECT shock treatment at least seven times in seeking to treat her major depressive disorder and severe anxiety, between April of 2015 and Spring of 2016. ECT shock treatment caused CHASE severe physiological, psychological, and emotional injury, including brain injury. Following treatment, CHASE did not know and had no reason to know that she had sustained a concussive brain injury from ECT use or that the symptoms she was experiencing post treatment were the result of a concussive brain injury, or would be long term or permanent.  CHASE incorrectly but reasonably believed that she was experiencing only minor short term side effects from ECT use that would improve over time as no information to the contrary was given to her by her medical providers.  Following treatment, CHASE also did not know and had no reason to know or suspect that wrongful conduct had caused her concussive brain injury, or that it was attributable to ECT manufacturers' violation of federal regulations, which caused ECT device to be available and recommended for use on her, without warning of the true risks of brain trauma and therefore without adequate informed consent.

50.    In the early part of 2017, in the course of having conferred with counsel, CHASE learned for the first time that Defendants had failed to comply with multiple administrative orders by the FDA, had never obtained FDA approval for their ECT devices, and had never maintained a system for the timely investigation, evaluation, and reporting of adverse events, and that this wrongful conduct on the part of Defendants had caused ECT to be available as a recommended treatment, caused her to be a recommended candidate and caused her to undergo ECT treatment and to sustain the concussive brain injury.

51.    Prior to the end of 2016, when the Citizen Petition for reclassification and/or banning of ECT devices became public, she had no reason to suspect, or inquire as to, the wrongful conduct or the nature of her injuries caused by that conduct.  However, even if she had inquired earlier, no amount of inquiry would

have revealed the danger of concussive brain injury likely to result from ECT shock treatment or the wrongful conduct of Defendants in having failed to comply with regulatory requirements. This information was unavailable to the medical community at large and to these plaintiffs in particular, specifically because of Defendants' noncompliance with regulations, including failure to report adverse events attributable to ECT use in the MAUDE data base at any time prior to filing the within litigation.

## CLASS ACTION ALLEGATIONS

52.   Plaintiffs bring this action on behalf of themselves and all others similarly situated as this action satisfies the requirements of numerosity, commonality, typicality, adequacy of representation, and predominance and superiority[2] requirements of Federal Rules of Civil Procedure, Rule 23.

53.   The proposed Classes are defined as follows:

### PROPOSED CLASS DEFINITION

a.   All individuals in the United States who received ECT shock treatment in California after May 28, 1982, administered by an ECT shock device that was manufactured, sold and/or distributed by Defendants after May 28, 1982, and who suffered an injury as a result thereof, with the exception of paragraph 54 below.

b.   All spouses of such individuals that have suffered related loss of consortium damages.

54.   Excluded from the Class are government entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

55.   The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of individuals, as ECT shock treatment has been available and administered to the described Class for more than 30 years, with the

---

[2] Fed. R. Civ. P. 23(b)(3).

THIRD AMENDED COMPLAINT

annual estimate of ECT shock patients per year in California numbering in the thousands.  Although the exact number and identity of the class members is not presently known, the class can be defined and ascertained by means of the objective criteria, through strategic publication, and through coordinated discovery of the identities of all purchasers of ECT shock devices as sold by and obtained from MECTA and SOMATICS since the beginning of the class period.

56.     There are questions of law and fact that are common to the Class, and these common questions predominate over any questions affecting only individual Class members.  Among the questions common to the Class are:

a.      Defendants' statutory obligation not to market an adulterated or misbranded medical device and/or reporting requirements imposed by the FDCA;

b.      Whether the FDCA gives rise to a duty to warn;

c.      Whether Defendants violated statutory obligations and/or reporting requirements and/or breached their duty to warn;

d.      The dates of said violations and/or breaches;

e.      Whether, had Defendants complied with their statutory duties, their ECT devices would have been on the market;

f.      Defendants' efforts to comply and/or justifications for non-compliance with the reporting requirements and/or duty to avoid marketing an adulterated or misbranded medical device as may be offered by Defendants in their defense;

g.      Whether this lawsuit is preempted by the FDA's regulatory regime;

h.      Information as to the safety and effectiveness, or lack thereof, for the use of ECT shock devices;

i.      Whether ECT shock devices cause craniocerebral trauma;

j.      Information known or knowable to Defendants over time

regarding the safety and effectiveness, or lack thereof, of the use of ECT shock devices;

       k.     Whether Defendants' culpable state of mind in failing to comply with federal statutory duties and their parallel state counterparts subjects Defendants to punitive damages.

57.    Common questions of fact and law predominate over any questions affecting only individual Class members with respect to liability. Alternatively, the common issues of liability such as regulatory noncompliance, federal preemption, generic causation of brain injury resulting from ECT, state-of-the-art, and punitive damages are outcome determinative and so significant that common, class-wide determination of those issues, bifurcated from individual issues of assumption of risk and extent of compensatory damages, would materially advance the disposition of the litigation relating to the regulatory violations at issue in this Complaint, even if common issues do not predominate so that certification of the entire action is warranted.

58.    The claims of Plaintiffs are typical of the claims of Class in that Plaintiffs underwent ECT shock treatment using an ECT shock device manufactured, sold and/or distributed by Defendants. Plaintiffs, like the Class members, would not have been injured in the absence of Defendants' noncompliance and wrongful conduct. Plaintiffs, like the class members, were denied access to critical information and appropriate recommendations from and through their medical providers which providers would have acted, treated, and recommended differently had Defendants complied with statutory requirements, and had Defendants disseminated critical information and warnings to the medical community.  Plaintiffs, like Class members, would not have been recommended candidates for ECT shock treatment and would not have undergone ECT shock treatment.  Additionally, the ECT devices, it is alleged and believed, would not have been marketed, manufactured, sold and/or distributed, or available within the

stream of commerce, but for Defendants' noncompliance with regulatory requirements as these devices are adulterated, misbranded, and defective.

59.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to the interest of any of the other Class members.

60.     Plaintiffs are committed to the vigorous pursuit of this action and have retained competent counsel with the necessary experience and skill to prosecute this action on behalf of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The issues that may be jointly tried, when compared to those requiring separate adjudication, are so numerous and substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.  In light of the allegations made, individual litigation to resolve the whole of this matter would be unnecessarily costly and burdensome and would deter individual claims.

62.     To attempt to resolve the entirety of this claim by processing individual cases would increase both the expenses and the delay, not only to class members, but also to Defendants and the Court.  In contrast, a class action will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

63.     Without class certification, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed class that would establish incompatible standards of conduct for Defendants.

///

 ///

1

## SUBSTANTIVE ALLEGATIONS

2     64.   The regulation of devices, including ECT devices, is relatively new.

3   The United States Congress enacted the Medical Device Amendments of 1976 (the

4   "MDA"), effective May 28, 1976, amending the FDCA "to provide for the safety

5   and effectiveness of medical devices intended for human use."

6     65.   Pursuant to the MDA, the FDA was required to review all existing

7   medical devices and, by regulation, divide each into one of three classes of devices

8   established to control access to the market depending on the intended use, the

9   indications for use, and the risks that the particular device posed to the user.  A

10   Class I ("General Controls"), device was subject to general post-market or after-sale

11   controls including good manufacturing practices.   A Class II ("Performance

12   Standards") device was to be subject to FDA established regulations for

13   performance standards as well as post-market controls.  A Class III ("Premarket

14   Approval") device required a premarket approval application ("PMA") and

15   approval before sale, or a product development protocol, and adherence to post-

16   market controls.  By way of contrast, a wheelchair is an example of a Class I device

17   while an implantable pacemaker is an example of a Class III device.

18     66.   On September 4, 1979, the FDA published an Order in the Federal

19   Register (the "1979 FDA Order") presenting its "final ruling" that ECT devices are

20   Class III "Premarket Approval" devices under the MDA and specifically ordered

21   manufacturers such as Defendants to prepare and submit a PMA for approval.  The

22   FDA's ruling stated in relevant part:

23            "The Food and Drug Administration (FDA) is issuing a
            final ruling classifying electroconvulsive therapy devices
24            into Class III (premarket approval).  The effect of
            classifying a device into Class III is to require each
25            manufacturer of the device to submit to FDA a premarket
            approval application ["PMA"] that includes information
26            approval application ["PMA"] that includes information
            concerning safety and effectiveness tests for the device."[3]
27

28   ---
   [3] *See* 44 Fed. Reg. 172, at 51776-77 (Sept. 4, 1979) (reporting 21 C.F.R. § 882 [Docket No. 78N-1103]).

67.    The FDA's Order followed the recommendation of the Neurological Section of the Respiratory and Nervous System Devices empaneled by the FDA, due to the lack of available information regarding the safety of ECT devices and following public comment.  The FDA concluded that Class III placement was required as "there is insufficient information to establish a standard to provide reasonable assurance of the safety and effectiveness of the ECT device."[4]

68.    As of September 4, 1979, Congress intended that Defendants herein, as manufacturers of ECT devices, submit a PMA application to the FDA for approval of this Class III device as a prerequisite to continued access to the market.  The PMA application was to contain "safety and effectiveness" information derived from testing, e.g., from clinical trials.  Moreover, PMA applications are required to include "specimens of the labeling proposed to be used for such device,"[5] to be submitted for FDA approval.

69.    Defendants have been the sole ECT device manufacturers in the United States market since at least 1985, and have held 100% of the US market share since that time. Defendants have never submitted a premarket approval application, nor have ECT devices ever been granted premarket approval, which is the FDA's official (and only) determination of "safety and effectiveness" for Class III medical devices.

70.    Plaintiffs are informed and believe and based thereon allege that Defendants have never conducted human trials in order to support their continued claims of their devices' "safety and effectiveness." Defendants continued to manufacture, sell and distribute their respective devices in the United States, and otherwise enabled their continued use, despite a lack clinical proof of safety or effectiveness and Congress's intent that they prove such to the FDA.

///

---

[4] *See* 21 C.F.R. § 882.5940.
[5] 21 U.S.C. § 360e(c)(1)(F).

THIRD AMENDED COMPLAINT

71.     Plaintiffs are informed and believe and based thereon allege that prior to the filing of the Complaint in this action, Defendants failed to investigate, evaluate injury, and submit reports to the FDA whenever the Defendants received or otherwise became aware of information that reasonably suggested that one of their marketed devices may have caused or contributed to a death or serious injury, as required by federal law.  Failure to submit such adverse event reports resulted in Defendants' ECT devices being "misbranded" under federal law.[6]  Defendants continued to manufacture, sell, and distribute their respective devices in the United States, and otherwise enabled their continued use, despite being "misbranded" under federal law.

72.     The United States Congress enacted the Safe Medical Devices Act of 1990 ("SMDA"), effective November 28, 1990, amending the FDCA "to make improvements in the regulation of medical devices."  Thereafter, the FDA published an Order in the Federal Register (the "1995 FDA Order") pursuant to the SMDA requiring that the manufacturers of ECT devices, including Defendants, submit a summary of, and a citation to, all information known or available about the safety and effectiveness of their respective ECT devices to the FDA by August 14, 1997.[7]

73.     Plaintiffs are informed and believe and based thereon allege that Defendants violated the SMDA, and the 1995 FDA Order, by failing to submit a summary of, and a citation to, all information known or available about the safety and effectiveness of their respective ECT devices to the FDA by August 14, 1997.  Defendants continued to manufacture, sell and distribute their respective devices in the United States, and otherwise enable their continued use. This rendered all of Defendants' ECT devices misbranded on separate legal grounds.

74.     On April 9, 2009, the FDA published a third Order in the Federal Register (the "2009 FDA Order") again requiring the manufacturers of ECT

---

[6] 21 U.S.C. § 352(t).
[7] 60 Fed. Reg. 156, at 41986-89 (Aug. 14, 1995).

devices, including Defendants, to comply with the SMDA by submitting all information known or available about the safety and effectiveness of ECT devices to the FDA by the deadline of August 7, 2009.[8] Defendants responded to this order, but withheld a significant amount of information relating to adverse events from the FDA. None of the information provided directly or adequately addressed the known issues of permanent memory loss, cognitive impairment, or the certainty of electrically-induced brain injury and other intracranial insults resulting from ECT. Thus, Defendants rendered their own devices misbranded on yet another ground.

75.    The FDCA's implementing regulations provide that manufacturers of medical devices must report to the FDA within 30 calendar days after the day that the manufacturer receives, or otherwise becomes aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer: "(1) may have caused or contributed to a death or serious injury; or (2) has malfunctioned and this device or a similar device that [the manufacturer has marketed] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur."[9]

76.    The regulations provide that manufacturers must submit all information "reasonably known." "Reasonably known" information is "(i) [a]ny information that you can obtain by contacting a user facility, importer, or other initial reporter; (ii) any information in your possession; or (iii) any information that you can obtain by analysis, testing, or other evaluation of the device."[10]

77.    Defendants continued to violate the SMDA, and related orders, by failing to produce reasonably known information and by withholding data from the FDA relating to the safety and effectiveness of their respective ECT devices, including data relating to the devices' collective propensity to cause harm. In response to each and every one of the thousands of instances of Defendants'

---

[8] 74 Fed. Reg. 67, at 16214-17 (Apr. 9, 2009).
[9] 21 C.F.R. § 803.50(a).
[10] 21 C.F.R. § 803.50(b).

THIRD AMENDED COMPLAINT

becoming aware of information reasonably suggesting death or serious injury with which their devices may be associated, Defendants conducted no investigation and reflexively rationalized, with no scientific justification at all, any alleged harm as resulting from an "underlying psychiatric condition" rather than the true obvious cause: the inducement of a major motor seizure through application of electricity to the crania of patients.[11] All devices designed to cause a major motor seizure through application of electricity to the cranium, regardless of design or technical specifications, present an unavoidable risk of serious trauma to the brain.

78.    Plaintiffs are informed and believe and based thereon allege that the overwhelming weight of scientific evidence relating to ECT shock treatment suggests that there is no long-term benefit to receiving ECT shock treatment at all, that the alleged short-term benefits are transient and are little more than a bout of mania following brain damage, that ECT shock treatment inherently damages the brain, and that any mechanism of action by which it is said to 'treat' depression or mental illness is hypothetical.

79.    As a result of the Defendants' conduct in violating statutory requirements and selective withholding and manipulation of the data surrounding ECT devices, and the duties under state law running parallel to such requirements, the devices have continued to be manufactured, sold, distributed and have remained in use without testing, public dissemination of reliable information and data as to safety and effectiveness, warnings of inherent dangers, and without the requisite premarket FDA approval.

80.    As evidenced by the warnings and consent forms that patients encounter prior to ECT, all or nearly all psychiatrists that administer ECT in the United States are under the impression that they have found a way to induce a major motor seizure in patients through application of electricity to the cranium with no

---

[11] 21 C.F.R. § 882.5940 (regulatory definition for electroconvulsive therapy devices, the predicate device type for all modern ECT devices).

risk of causing craniocerebral trauma at all. Proper compliance by Defendants with the pre-market screening and post-market surveillance obligations imposed on medical device manufacturers by the FDCA would have corrected this misperception among the psychiatric community and ensured conveyance of an adequate warning to patients, potentially ultimately resulting in a drastic curtailment or even non-use of Defendants' ECT devices on all or virtually all classes of patients.

81.     Defendants continue to manufacture, sell and distribute adulterated, misbranded, and defective ECT devices to this day.  Doing so violates both a duty established under federal statute and parallel duties under state tort law. Had Defendants refrained from marketing adulterated and/or misbranded medical devices as was required by the FDCA, they would have stopped manufacturing and/or distributing their devices when the FDCA begun to prohibit the introduction into interstate commerce of adulterated and/or misbranded medical devices, or the introduction into interstate commerce of devices without a system in place for the timely investigation, evaluation, and reporting of adverse events.

82.     The FDA's guidance document pertaining to medical device reporting states that "a publicly disclosable version of the medical device reports that we have received is available on the CDRH webpage at http://www.accessdata.fda.gov/ scripts/cdrh/cfdocs/cfMAUDE/search.CFM."[12] At the time of the original filing of this action, of the 49 reports that were posted on the MAUDE database pertaining to ECT devices, the majority were voluntarily submitted by patients, and none were submitted by device manufacturers under their mandatory reporting duties.  Had Defendants complied with their federal and parallel state duties to report to the FDA all safety and effectiveness data reasonably known or available for ECT, the FDA's MAUDE database would have, for decades, reflected the multitude of adverse

---

[12] MEDICAL DEVICE REPORTING FOR MANUFACTURERS: GUIDANCE FOR INDUSTRY AND FOOD AND DRUG ADMINISTRATION STAFF DOCUMENT 26 (2016).

events that routinely result from administration of ECT shock treatment.

83.    Adverse events have regularly resulted from administration of ECT shock treatment since ECT's inception in 1938 such as to make it virtually impossible that any ECT manufacturer could escape the FDCA's obligation to investigate and report these events to the FDA.  For example, from the 1940s to the 1980s, various psychiatric experts have documented brain damage correlated with ECT. A vocal "ECT survivor community" has been voicing their objection to the continued use of shock treatment for decades. Moreover, during FDA hearings between 2009 and 2010 in which the FDA opened a public docket seeking reports of adverse event complaints, ECT patients submitted thousands of adverse event complaints, hundreds of which alleged serious brain injury.   Both MECTA and SOMATICS became aware of these adverse event allegations, and therefore invoking their statutory duty to investigate, evaluate, and report the complaints to the FDA. However, there are no manufacturer-submitted adverse event reports in FDA's MAUDE database corresponding to those adverse event allegations, illustrating Defendants' continuous and intentional failure to investigate and/or report adverse events to the FDA.

84.    Multiple lawsuits were filed against MECTA Corporation in the 1990s. These lawsuits alleged serious injuries, including but not limited to brain damage, permanent cognitive impairment, and ruptured bowels resulting from ECT shock treatment.  The CEO of MECTA, Ms. Robin Nicol, admits that these lawsuits alleged that MECTA's devices caused brain damage to the patients. She testified that she was not even curious why multiple people had sued her company for causing them brain damage, assuming the lawsuits to be "frivolous." Defendants intentionally evaded their duty to investigate these adverse events or submit any adverse event reports to the FDA.

///

///

85.     "The Electroshock Quotationary" was published in 2006.[13]  It recounts an eighty-year history of serious adverse events including permanent brain damage resulting from ECT shock treatment, as well as the formation of patient advocate groups united in their continued opposition to ECT shock treatment. Moreover, it references testimony and studies by U.S. psychiatrists, in which the psychiatrists opine that ECT inherently damages the brain. No account of injury resulting from ECT shock treatment referenced in the Electroshock Quotationary went investigated and reported by Defendants.

86.     Many studies during the class period have suggested or documented reasonably known brain injury resulting from ECT shock treatment. For example, a study in Archives of General Psychiatry documented that cerebral atrophy was significantly more common in those patients who had ever received ECT.[14]

87.     A brain scan study confirmed that brain shrinkage was significantly more common in ECT recipients than other mental patients.[15]

88.     A study relating MRI scans of patients demonstrated a strong correlation between the numbers of previous ECT treatments to loss of brain tissue.[16]

89.     Another study found that ECT recipients were twice as likely to have a measurable loss of brain tissue in the front area of the brain and a tripling of the incidence of a loss of brain tissue in the back of the brain.[17]

90.     Finally, a particularly graphic study documented intra-cranial bleeding resulting from ECT shock treatment administered using current ECT devices.[18]

---

[13] LEONARD ROY FRANK, THE ELECTROSHOCK QUOTATIONARY (2006), http://www.endofshock.com/102C_ECT.PDF.
[14] Weinberger et al., *Structural Abnormalities in the Cerebral Cortex of Chronic Schizophrenic Patients*, 36 ARCHIVES GEN. PSYCHIATRY, 935-39 (1979).
[15] Calloway et al., *ECT and Cerebral Atrophy: A CT Study*, 64 ACTA PSYCHIATRICA SCANDINAVICA 442-45 (1981).
[16] Andreasen et al., *MRI of the Brain in Schizophrenia*, 47 ARCHIVES GEN. PSYCHIATRY, 35-41 (1990).
[17] R.J. Dolan et al., *The Cerebral Appearance in Depressed Subjects*, 16 PSYCHOL. MED., 775-79 (1986).
[18] Kulkarni & Melkundi, *Subdural Hematoma: An Adverse Event of Electroconvulsive Therapy – Case Report and Literature Review*, CASE REPORTS IN PSYCHIATRY (2012).

Defendants remained willfully ignorant of the adverse events in these and other reasonably known studies in an attempt to evade their FDCA reporting duties.

91.     Shock treatment is covered by numerous federal programs including Medicare and is sufficiently remunerative to keep entire psychiatric facilities in business.

92.     Defendants conducted no investigation corresponding to the allegations in the original Complaint in this action, or the medical literature cited herein, within thirty days of its filing on September 11, 2017.

93.     The FDA brought specific reportable events to the attention of both Defendants during facility inspections. Defendants did not timely investigate and/or report those specific events.

94.     In sworn deposition testimony in 2004, in an unrelated suit, the CEO of MECTA, Robin Nicol, was asked if she or anyone from her company had "made any effort to solicit information from persons who have received ECT to see whether or not they have been harmed." She responded "no . . . that is not in the purview of our company's responsibilities."

95.     In SOMATICS, LLC's 2009 response to the FDA's third Order, the manufacturer states: "[t]he Somatics Thymatron ECT device has already been in functional class II during its entire lifetime of 25 years . . . ." Since ECT devices are officially classified into Class III based on their potential risk to human health and safety, and because Class II devices are generally safer than Class III devices, such a statement is misleading to health care providers and to patients, who may be led to believe that ECT is safer than it actually is. The only sense in which ECT devices are "functionally in Class II" is in that ECT devices have managed to reach the market without the submission of a premarket approval application. Premarket approval is a safeguard applied only to Class III devices by virtue of their unreasonable risk of causing injury, and the only reason ECT devices have managed to stay on the market without submission of premarket approval

applications is because Defendants failed to submit them when due.  Accordingly, in attempting to demonstrate the safety of SOMATICS' ECT devices, SOMATICS instead draws attention to their regulatory noncompliance.

96.    Also, in their 2009 submission to the FDA, SOMATICS states: "[i]n the ensuing 25 years [since clearance of the Thymatron] there has been no occurrence of a reported adverse event." Given the multitude of adverse events that regularly result, and have resulted, from ECT shock treatment, this statement is an admission that SOMATICS, LLC has not reported any of the adverse events that have occurred as a result of use of their Thymatron devices in 25 years. In the same submission to the FDA, SOMATICS, LLC claimed a lack of evidence of any ECT-induced permanent memory loss in patients past the six-month mark after the procedure.

97.    SOMATICS, LLC has used a contract manufacturer unregistered by the FDA, Elektrika, Inc., to manufacture its devices for decades.

98.    Had the FDA's MAUDE database accurately reflected the multitude of adverse events that result routinely from ECT treatment, those adverse events would have been noticed by professionals in the psychiatric field, addressed in academic and medical literature, discussed at meetings and conferences attended by psychiatrists within California and the United States generally, and altogether well-known by the general public.

99.    Had Defendants satisfied their reporting duties, ECT patients' medical providers would have been properly informed by the FDA's MAUDE database, by medical and academic literature discussing the adverse events in the MAUDE database, by meetings they attended at which the adverse events resulting from ECT would have been discussed, by general public discussion, and thereafter by direct warning from the FDA as to the inherent risks associated with ECT.  ECT is inherently harmful to the human brain, but this fact is not publicly known because of Defendants' breach of their FDCA reporting duties and all state common law

duties running parallel to those FDCA reporting requirements.

100.   But for Defendants' breach of their federal and state reporting duties that arose out of the requirements imposed by the FDCA and the FDA's multiple orders, the putative class's medical providers would have had knowledge of the risk inherent in ECT shock treatment in time to prevent the putative class's injuries. Plaintiffs' medical providers, with knowledge that modern ECT devices actually have not managed to mitigate the risk of brain trauma resulting from induced seizures through application of electricity to the cranium, would have conveyed a warning to patients, as common law principles of informed consent require such warning of unavoidable risks of serious harm. Members of the putative class would then have been in a position to either give informed consent or refuse the treatment entirely.   Moreover, medical providers would have acted different, including severely limiting recommendations, or ceasing to recommend ECT shock treatment altogether for all or virtually all patients.

101.   But for Defendants' marketing of adulterated, misbranded, and defective medical devices, plaintiffs would not have had access to ECT shock treatment, and would not have suffered the injuries alleged herein.   Accordingly, but for Defendants' conduct in manufacturing and marketing their devices, ECT shock devices would not exist in their current form, if at all.

102.   ECT shock devices are defined in the FDA's regulations without reference to particular manufacturers, and use of any device meeting the regulatory definition presents an unavoidable risk of craniocerebral trauma to patients. Thus, any warning of adverse events by one manufacturer would have been reported under the same category of "Device, Electroconvulsive Therapy" on the FDA's MAUDE database. The same warning and testing requirements applied to all manufacturers, and warnings submitted by one manufacturer would have by definition alerted all healthcare providers of the dangers posed by any manufacturer's ECT devices.  Accordingly, by failing to report adverse events to the

FDA and failing to furnish other required safety and effectiveness information to the FDA, each Defendant actually and proximately caused the injuries suffered by every member of the putative class without regard to which Defendant manufactured the particular device that caused the particular injury.

103.   Many putative class members are unable to ascertain which of the Defendants manufactured the particular device that contributed to their injuries, but Plaintiffs are informed and believe that  MECTA and SOMATICS have collectively held 100% of the United States market share in ECT dating back to at least 1985. No other manufacturers have manufactured any ECT devices in the United States since then.

104.   Defendants concealed the facts such that no plaintiff reasonably would have known of facts giving rise to this suit: namely, that MECTA CORPORATION and SOMATICS, LLC comprehensively failed to investigate adverse events, conduct human clinical trials, and report all safety and effectiveness data known or available relating to the use of their ECT devices to the FDA, as was required by multiple FDA orders and the state medical device warning duties running parallel thereto. Whenever either Defendant encountered adverse safety information, they reflexively attributed it to "severe depression," "bipolar" or any other psychiatric condition without acknowledgement of the fact that seizures, grand mal or otherwise, are to be assiduously avoided according to the rest of the medical profession. To this day, Defendants seemingly attribute it to coincidence that the "side effects" of ECT are identical to the symptoms of trauma to the brain.

105.   Medical literature and studies purporting to prove that ECT does not cause brain injury is methodologically flawed. Researchers seeking to study the adverse safety risks presented by ECT have difficulty obtaining funding in the United States. Defendants, holding a strong interest in preventing public revelation of the unavoidable risk of intracranial insult and/or craniocerebral trauma presented by ECT, have maintained improper ties and provided kickbacks and/or honoraria to

opinion leaders and those responsible for determining who gets funding for research into ECT's safety and effectiveness in an attempt to prevent public revelation of ECT's adverse safety risks. Plaintiffs believe the primary motive behind this behavior is to ensure that funds from federal programs keep numerous psychiatric units financially afloat.

106.   Because of Defendants' fraudulent concealment of facts, no member of the putative class knew or should have known that Defendants failed to comply with federal statutory requirements or of the dangers inherent in use of ECT shock devices that gave rise to their claims asserted herein.

107.   Plaintiffs diligently filed this suit in a timely fashion upon discovering the facts giving rise to the claims asserted herein, namely that Defendants failed to satisfy the reporting requirements imposed by the FDCA, MDA and SMDA.

## FIRST CLAIM FOR RELIEF

### Negligence/Negligence *Per Se* (Adulteration and Misbranding)

### (By Plaintiffs against all Defendants)

108.   Plaintiffs hereby re-allege, and incorporate by reference as though fully set forth herein, paragraphs 1 through 107 of this Complaint.

109.   MECTA and SOMATICS failed to respond to the FDA's Order requiring submission of a summary of, and a citation to, all data known or available concerning the safety and effectiveness of their ECT devices by August 14, 1997, and August 7, 2009, respectively.  Failure to furnish such information rendered all of their devices misbranded.

110.   MECTA and SOMATICS, according to their own contentions, manufacture and introduce into interstate commerce devices that have different intended uses, and different technical characteristics that raise new questions of safety and effectiveness when compared to their predicate devices. Moreover, their predicate devices were not legally marketed. This renders all of Defendants' devices adulterated.

111.   Neither MECTA nor SOMATICS have ever had in place a system for the timely investigation, evaluation, and reporting of adverse event complaints to the FDA, and they have never reported an adverse event despite countless instances of becoming aware of information reasonably suggesting death or serious injury associated with their devices.

112.   SOMATICS utilizes an unregistered contract manufacturer to manufacture all of their devices. This renders SOMATICS' devices misbranded.

113.   Defendants have had and continue to have a duty of reasonable care under California state common law to refrain from the manufacture, delivery, or introduction into interstate commerce of adulterated and/or misbranded devices. Such devices are legally defective.

114.   MECTA and SOMATICS breached those state common law duties owed to the putative class when they continued to market their adulterated and misbranded medical devices for decades.

115.   M. BENJAMIN, RIERA, HIMES, SCURRAH, and CHASE, as well as all other members of the putative class, underwent ECT shock treatment delivered by ECT shock devices placed into the stream of commerce by one of the Defendants during the class period, and during the time that adulterated and misbranded ECT devices were being manufactured, sold and distributed.

116.   M. BENJAMIN, RIERA, HIMES, SCURRAH, and CHASE, as well as all other members of the putative class, have suffered, and/or continue to suffer concussive brain injury and ensuing cognitive impairment, severe permanent retrograde and anterograde amnesia, and acute and/or chronic organic brain syndrome and related injuries following and as a proximate result of ECT shock treatment and Defendants' breach of duty owed to plaintiffs.  This harm is of the type sought to be prevented by the passage of the FDCA, MDA, and SMDA, and Plaintiffs, as recipients of Class III medical devices, are of the class of plaintiffs the applicable statutes and regulations are intended to protect.

117.   Had Defendants complied with their state law duties requiring them to refrain from manufacturing, delivering, or introducing into interstate commerce their misbranded and adulterated devices, those devices would never have reached or injured the putative class.  Accordingly, compensatory damages are appropriate.

118.   Defendants acted with oppression, fraud and malice. As such, punitive damages are appropriate.

## SECOND CLAIM FOR RELIEF

**Negligence/Negligence *Per Se* (Failure to Timely Investigate, Evaluate, and Report Adverse Events)**

**(By Plaintiffs against all Defendants)**

119.   Plaintiffs re-allege and incorporate by reference paragraphs 1- 118 as if fully set forth herein.

120.   Defendants have and have had a continuous duty since the early 1980s to investigate, evaluate, and report information reasonably suggesting death or serious injury associated with their devices to the FDA within 30 days of discovering such information.

121.   In breach of said duty, Defendants encountered countless adverse event complaints and other information reasonably suggesting death or serious injury resulting from ECT, but never maintained a system for the timely reporting of adverse safety information and never submitted a single adverse event report to the FDA prior to the filing of this action.

122.   Had Defendants complied with their state law duties to report to the FDA all information the manufacturer becomes aware of, from any source, that reasonably suggests that its device may have caused or contributed to a serious injury (as was required by the FDCA), this information would have appeared prominently and accessibly in the FDA's MAUDE database and in medical journals, and would have been discussed at conferences attended by the psychiatric profession at large. The FDA also would have promulgated a warning to the end

users of ECT shock devices within the medical profession, who would have been on constructive notice of the latent dangers inherent in providing ECT shock treatment to members of the putative class in time to alter their conduct and their recommendations, and to convey a warning of craniocerebral trauma, thereby preventing a deprivation of informed consent and associated injuries as claimed. Accordingly, the negligent conduct of MECTA, and SOMATICS actually caused, proximately caused, and was a substantial factor in causing the harm suffered by members of the putative class. Accordingly, compensatory damages are appropriate

123.  Defendants acted with oppression, fraud, and malice. Accordingly, punitive damages are appropriate.

## **THIRD CLAIM FOR RELIEF**

### **Strict Product Liability– Failure to Warn**

### **(By Plaintiffs against all Defendants)**

124.  Plaintiffs hereby re-allege, and incorporate by reference as though fully set forth herein, paragraphs 1 through 123 of this Complaint.

125.  Defendants MECTA, and SOMATICS manufactured, distributed, and sold their ECT devices in the stream of commerce within the United States, knowing that they would be used without inspection for defect.

126.  The ECT devices, at all times relevant to the causes of action alleged in this Complaint, caused and continue to cause permanent brain damage, severe permanent retrograde and anterograde amnesia, and acute and/or chronic organic brain syndrome, and these facts were both known and knowable in light of the scientific and medical knowledge available in the medical and scientific communities.  Defendants' failure, at the time of manufacture and distribution, to adequately warn plaintiffs and medical providers by warning the FDA of these latent dangers and risks renders the devices adulterated, misbranded, and defective with respect to the marketing and information provided to the members of the

putative class alleged herein.

127.   Craniocerebral trauma and ensuing cognitive impairment, severe permanent retrograde and anterograde amnesia, and acute and/or chronic organic brain syndrome present a substantial danger to patients when ECT devices are used as intended or misused in a foreseeable way.

128.   Ordinary consumers would not recognize these potential risks inherent to ECT devices, especially in light of Defendants' aggressive marketing and promotion campaigns.

129.   MECTA and SOMATICS failed to investigate and provide adequate warnings of these risks.

130.   M. BENJAMIN, RIERA, HIMES, SCURRAH, and CHASE, as well as all other members of the putative class, suffer permanent brain damage, severe permanent retrograde and anterograde amnesia, and acute and/or chronic organic brain syndrome as a direct result of administration of ECT shock treatment. Plaintiffs and members of the putative class, had they been properly warned about the true nature of ECT shock devices, would not have received ECT treatment.

131.   Had Defendants complied with their state law duties to give a post-sale warning to the FDA of all information the manufacturer becomes aware of, from any source, that reasonably suggests that its device may have caused or contributed to a serious injury (as was required by the FDCA), this information would have appeared prominently in the FDA's MAUDE database and in medical journals and the FDA would have promulgated a warning to the end users of ECT shock devices within the medical profession, who would have been on constructive notice of the unavoidable risk of intracranial insult to patients in providing ECT shock treatment to members of the putative class and would have conveyed a warning of craniocerebral trauma in time to prevent their injuries.  Accordingly, the conduct of MECTA and SOMATICS actually caused, proximately caused, and was a substantial factor in causing the harm suffered by members of the putative class.

Therefore, compensatory damages are appropriate.

132.   Defendants acted with oppression, fraud and malice. As such, punitive damages are appropriate.

### FOURTH CLAIM FOR RELIEF

#### Strict Product Liability (Adulteration and Misbranding)

#### (Against All Defendants)

133.   Plaintiff incorporates by reference paragraphs 1-132 as if fully set forth herein.

134.   All of Defendants' ECT shock devices have been adulterated and/or misbranded for their entire life on the market. This regulatory noncompliance rendered all ECT defective for purposes of strict liability under California common law.

135.   But for Defendants' introduction of defective medical devices into interstate commerce, ECT shock devices would never have reached Plaintiffs or the putative class who therefore would not have suffered unwarned craniocerebral trauma secondary to shock treatment.

136.   Defendants acted with oppression, fraud and malice. As such, punitive damages are appropriate.

### FIFTH CLAIM FOR RELIEF

#### Loss of Consortium

#### (Against All Defendants)

137.   Plaintiffs hereby re-allege, and incorporate by reference as though fully set forth herein, paragraphs 1 through 136 of this Complaint.

138.   D. BENJAMIN and other members of the putative subclass are spouses of patients who underwent ECT shock treatment, and as a result have suffered a loss of consortium.

139.   D. BENJAMIN is and has at all times relevant to this Complaint been lawfully married to M. BENJAMIN. Other members of the putative class were in

valid and lawful marriages to persons injured by ECT shock treatment.

140.   Those injured by ECT shock treatment suffered tortious injuries as a result of Defendants' actions.

141.   D. BENJAMIN and those members of the putative class in marriages to those that have suffered injury resulting from ECT shock treatment have suffered a loss of consortium.

142.   That loss of consortium was a direct and proximate result of the Defendants' acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.      For compensatory damages in light of the pain and suffering, inconvenience, emotional distress, loss of consortium, loss of earnings, and lost earning capacity suffered by members of the putative class;

2.      For punitive damages in light of Defendants' oppression, fraud, and malice;

3.      For costs of suit and expenses incurred herein, including expert fees;

4.      For reasonable attorney's fees and such other nontaxable costs, subject to court approval, as provided by Rule 23(h) of the Federal Rules of Civil Procedure;

5.      For injunctive relief; and

6.      For all such other and further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated:  April 9, 2018                          Respectfully submitted,

                                        **DK LAW GROUP, LLP**

                              By:    /s/  _David M. Karen_
                                        David M. Karen, Esq.
                                        Attorneys for Plaintiffs

-38-

THIRD AMENDED COMPLAINT